* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. An employee-employer relationship existed at the time of the injury.
2. The employer was self-insured at the time of the injury, and Key Risk Management Services is its servicing agent.
3. The date of the injury is July 13, 1998.
4. The parties were subject to the North Carolina Workers' Compensation Act at the time of the injury, the employer employing the requisite number of employees to be bound under the provisions of the Act.
5. Defendant admitted plaintiff's back injury as compensable by Form 60 dated August 31, 1998, and defendant has paid plaintiff disability compensation at the rate of $488.02, based upon an average weekly wage of $732.00, for the period from August 13, 1998 through December 28, 2002.
6. Plaintiff experienced the onset of a medical condition consisting of a complex of symptoms, including but not limited to respiratory dysfunction, in approximately December 1999 or January 2000, and defendant denied the causal relationship of said condition to the injury of July 13, 1998 and has not paid medical compensation for said condition.
7. The parties mediated this case on October 17, 2000, and pursuant to Industrial Commission Order, defendant paid the entire mediator's fee of $625.00
8. The parties stipulated into evidence, without need for further authentication or verification, the following:
 • Stipulated Exhibit 1 — Medical records from miscellaneous providers;
 • Stipulated Exhibit 2 — Medical records from Halifax Regional Hospital;
 • Stipulated Exhibit 3 — Medical records from the University of Virginia;
 • Stipulated Exhibit 4 — Defendant's response to plaintiff's Motion regarding surgery; and
 • Stipulated Exhibit 5 — Medical records from Dr. Roger W. Browne.
9. The issues to be answered by the hearing commissioner are (1) whether plaintiff's medical condition, consisting of a complex of symptoms, including but not limited to respiratory dysfunction, with onset of approximately December 1999 or January 2000, is causally related to the compensable injury of July 13, 1998, (2) if so, what benefits plaintiff is entitled to receive as a result of said condition, (3) in the absence of further surgery or pain management recommended by the plaintiff's treating physicians whether plaintiff was and is disabled from earning the same or greater wages or is permanently and totally disabled, (4) what amounts, if any, shall be payable to Carol Thomas or Priscilla Franklin for nursing and assistive care, (5) what ongoing medical treatment is necessary to manage plaintiff's pain and provide relief, and (6) N.C. Gen. Stat. § 97-35.
 * * * * * * * * * * *
Based upon all the competent evidence of record, the undersigned makes the following additional
 FINDINGS OF FACT
1. Plaintiff was employed by defendant-employer as a registered home health nurse. On July 13, 1998, plaintiff fell and injured her back. Her claim for injuries to her back was accepted on a Form 60, and defendants provided plaintiff with medical treatment and disability compensation.
2. Plaintiff is a 57-year-old female.
3. Prior to her injury at work on July 13, 1998 and her hospitalization on January 7, 2000, plaintiff had a number of significant pre-existing respiratory conditions. She has had allergic asthma since she was a child. She has had a number of bouts with bronchitis and sinus infections. She was diagnosed with narcolepsy. She had an allergic reaction to cinnamon from an incense burner in 1996 that was so extreme she went into anaphylactic shock and severe respiratory distress. Before January 2000, plaintiff was receiving allergy shots once a week and used an inhaler for treatment of breathing difficulties related to her allergies. Before January 2000, plaintiff was also taking the respiratory medications Singulair, Serevent and Flovent.
4. Plaintiff also had been diagnosed with Chronic Obstructive Pulmonary Disorder (COPD). This is a diagnosis that includes a number of serious respiratory conditions such as emphysema. Plaintiff was diagnosed with emphysema. Plaintiff claimed she did not know she had COPD, but this claim is not deemed credible in light of the medical records documenting the diagnosis, which also include a specific request from plaintiff to Dr. Browne that he not include the diagnosis of COPD in her records.
5. Plaintiff was a heavy smoker, consuming one and a half to two packs of cigarettes a day since she was a teenager. Plaintiff claimed she had greatly reduced the amount that she smoked prior to the events giving rise to this claim. This allegation is not deemed credible because it is not consistent with what plaintiff reported to the adjuster involved in her claim.
6. Plaintiff underwent treatment for her back with several medical providers, including orthopeadic surgeon Dr. Thomas Dimmig and physiatrist Dr. Robert Wilson.
7. Dr. Dimmig is an expert in the field of orthopedic surgery, specializing in spinal surgery. Plaintiff reported to him on October 29, 1998 complaining of neck and back pain. Dr. Dimmig's initial impression was cervical and lumbar pain that should improve. Dr. Dimmig prescribed physical therapy to rehabilitate plaintiff to a functional state. She was released to return to half days of work, with no bending and lifting over 20 pounds.
8. Dr. Dimmig followed plaintiff through November and December 1998. On December 17, 1998, Dr. Dimmig was of the opinion that plaintiff had reached maximum medical improvement. He assigned work restrictions of no lifting over 25 pounds and no repetitive bending and a permanent partial impairment rating of 5% of the spine.
9. Plaintiff continued to complain of pain. MRI scanning and myelograms in January 1999 revealed cervical mild spondylolysis, from degenerative disk changes of what was determined a mild nature at C5-6 with a little bit of bulging of the disk, eccentric to the left side. There was no real ruptured disk component and no spinal stenosis, which is narrowing of the canal, or nerve compression of any sort. The lumbar spine report revealed a small, left side parietal disk herniation at L3-4 and degenerative disk changes with some bulging at L4-5 of a fairly moderate nature and no nerve pressure at that level. Because plaintiff continued to complain of pain, Dr. Dimmig referred her to Dr. Wilson for pain management.
10. Dr. Wilson is an expert in the fields of physical rehabilitation medicine and pain management. He treated plaintiff for her back from March 22, 1999 until August 16, 1999, primarily with epidural steroid injections. At the first visit, Dr. Wilson felt plaintiff could work and released her with restrictions of no lifting over 20 pounds occasionally, and no repetitive bending, twisting, or lifting, four hours per day. A commuting restriction of fifteen to twenty minutes each way was added on June 17, 1999. After conservative measures failed to alleviate plaintiff's complaints, Dr. Wilson referred plaintiff back to Dr. Dimmig.
11. Plaintiff returned to Dr. Dimmig on September 13, 1999. At that time, Dr. Dimmig recommended cervical fusion surgery, removing C5-6 and fusing that level, which was scheduled for October 11, 1999. With regard to his recommendation for surgery, Dr. Dimmig testified that plaintiff did not fit the ideal criteria for that kind of surgery, and that he only recommended it as sort of a "last attempt" to help her. Dr. Dimmig felt the surgery would improve plaintiff's symptoms 25-50%. Defendants sent plaintiff for a second opinion with Dr. Koeleveld. Plaintiff's surgery was canceled after plaintiff saw Dr. Koeleveld who recommended plaintiff first try Neurontin for her complaints prior to considering surgery. No doctor had removed plaintiff from all work as of this time.
12. Dr. Dimmig was of the opinion that plaintiff could safely work within the restrictions assigned by Dr. Wilson. Dr. Dimmig was unable to express an opinion whether the abnormalities in plaintiff's cervical and lumbar spines were causing her symptoms. According to Dr. Dimmig, this was because "there were lots of issues with her and it seemed difficult to isolate one, or even two, locations that could be causing all of her symptoms. So it is possible that the neck disk and the lumbar disk were causing some of her issues with her musculoskeletal system. I would say all along it was hard for me to believe that they were causing the complete disability that she seemed to be experiencing, for such reason."
13. Dr. Dimmig indicated it was difficult for him to understand the amount of symptomology and disability plaintiff was claiming on the basis of her physical findings on examination and studies which were minimal. Dr. Dimmig could not state that the fall of July 13, 1998 caused the minimal positive findings plaintiff demonstrated on MRI. Dr. Dimmig was of the opinion that plaintiff's musculoskeletal pain was caused by her compensable injury.
14. Dr. Dimmig's work restrictions and rating were based upon plaintiff's reports of continued symptoms. Notwithstanding the restrictions he assigned in his records before, Dr. Dimmig felt that plaintiff should have been able to work eight hours a day, and ride in a car for 30 minutes at one time. He stated that she should have been able to, "sit at a desk, do paperwork, work on the computer. She could do health-related duties that didn't require her to do repetitive bending or any kind of independent patient transferring, heavy kind of things. But I would expect from the way she presented, from the mechanism of her injury, from what we found on her studies and all of that, that she should be able to do those kinds of things."
15. Plaintiff was prescribed Neurontin by Dr. Koeleveld in November 1999. Plaintiff first began taking the medication on December 14, 1999. Due to complaints of lethargy and fatigue she experienced immediately thereafter, plaintiff's dosage of Neurontin was reduced by two-thirds on December 17, 1999, from 300 mg to 100 mg. Plaintiff made no complaints about fatigue or lethargy to any of her medical doctors or health care providers thereafter.
16. Plaintiff was alert and active enough to accept the responsibility of driving a sick child to the doctor and driving to the pharmacy shortly before January 7, 2000. Plaintiff was sufficiently alert to leave her house on January 4, 2000 and get a flu shot. There is no record of plaintiff reporting to her doctors continued somnolence after her dosage was reduced, whereas she had reported those problems to her doctors before. Plaintiff saw her primary care doctor on January 4, 2000 for complaints of sinusitis, but did not report any somnolence. The emergency room admission records document that plaintiff was awake and alert when she sought treatment for breathing difficulty on January 7, 2000.
18. On January 4, 2000, plaintiff was diagnosed with sinusitis. She was prescribed the antibiotic Biaxin by her family physician. While plaintiff denied being allergic to Biaxin, the Halifax Regional Hospital notes state that plaintiff reacts with dyspnea or shortness of breath from exposure to the medication.
19. On January 7, 2000, plaintiff woke up having difficulty breathing. She went to the emergency room at Halifax Regional Hospital. She had a fever and a slightly elevated white blood count upon admission, indicating she likely had an infection at the time she arrived. Plaintiff was treated for asthma, but it became apparent that plaintiff's condition was much more serious. Plaintiff's condition did not respond to Benadryl and steroids which were given to treat asthma. She was subsequently diagnosed with pneumonia.
20. Plaintiff's pneumonia led to general respiratory and renal failure. Plaintiff was transferred to the University of Virginia Medical Center, where she survived the episode and eventually was released. Plaintiff's condition subsequently improved, and she returned to almost her pre-hospitalization state. However, in August of 2001, plaintiff suffered a relapse due to "tracheostenosis", an infection that resulted in her trachea being 50% closed and requiring supplemental oxygen full time. Plaintiff has been totally disabled as a result of her pneumonia and resulting respiratory failure since August of 2001.
21. Plaintiff returned to see Dr. Wilson on March 3, 2003. Her overall medical condition was much worse due to breathing problems, but her physical condition was hard to assess for any significant change and a MRI revealed films that were the same or slightly worse. On July 7, 2003, plaintiff received an epidural injection to the neck with significant improvement.
22. Plaintiff presented the expert testimony of Theodore Francis Shults. Mr. Shults is a toxicologist and an attorney. He testified on behalf of plaintiff as an expert in the field of forensic toxicology. He is not a medical doctor, and does not have a Ph.D.
23. Mr. Shults was of the opinion plaintiff's pneumonia and resulting hospitalization were due to side effects from taking Neurontin. However, Mr. Shults looking at the total picture, couldn't say "but for" Neurontin, plaintiff would not have been admitted, she would not have the respiratory shortness.
24. Mr. Shults relied on the PDR or package insert for Neurontin. However, there was no attempt in the clinical study that formed the basis of the PDR to determine whether there was actually a causal relationship between the Neurontin and the pneumonia. The report of the adverse events in the package insert in one out of 100 people could be the result of a causal relationship or it could be purely coincidental. It is impossible to determine from the PDR package insert that pneumonia is, in fact, a known side effect of the use of Neurontin. Scientific certainty is achieved by doing controlled studies and having the studies peer reviewed for other problems. That is not available in this case.
25. Mr. Shults opined there are a number of other possible causes for plaintiff's respiratory problems besides the use of Neurontin or subsequent somnolence. One of the primary factors underlying his causation opinion was the temporal relationship between the onset of plaintiff's problems and the use of Neurontin.
26. The only other specific support cited by Mr. Shults was one anecdotal story of a gentleman in New York who also developed difficulty breathing at the same time he happened to be taking Neurontin. However, Mr. Shults confirmed that this report was printed only as a letter to the editor and not as a controlled and scientifically reliable study.
27. Defendants presented the expert testimony of Dr. Victor S. Roth. Dr. Roth testified as an expert medical doctor specializing and board certified in occupational medicine. In addition to being a practicing medical doctor, Dr. Roth also has a master's degree in public health. He is a professor at the University of Michigan School of Public Health, and he has written numerous articles on workplace respiratory issues, including environmental mold, chemical exposures and occupational asthma. Dr. Roth's training and board certification required study and understanding of toxicology.
28. Dr. Roth was of the opinion that there was nothing in any of the clinical trials of Neurontin that would indicate that pneumonia was part of a toxicology for Neurontin. Dr. Roth was not aware of any other source of information that would establish a cause and effect relationship between Neurontin and pneumonia. There similarly are no peer review studies that show a relationship. Therefore, Dr. Roth explained it is not correct to call pneumonia a known side effect of the use of Neurontin.
29. With regard to the one letter cited by Mr. Shults, Dr. Roth made clear this was one, uncontrolled, purely anecdotal case. He also explained that there are a number of significant differences between that report and plaintiff's case. First, and most importantly, there was no evidence of actual pneumonia in the case of the New York gentleman. That gentleman, unlike plaintiff, also did not have any cough, increased sputum, fever or changed x-ray. Furthermore, plaintiff's problems did not stop after Neurontin was discontinued, unlike the man from New York's problems.
30. Dr. Roth was of the opinion that plaintiff's past medical history strongly supports medically proven reasons for her to develop pneumonia: pre-existing severe emphysema or COPD from smoking that continued right up to her hospitalization and a severe case of sinusitis for which plaintiff requested antibiotics only three days prior to the hospitalization. Sinusitis is a bacterial infection in the sinuses that can drain into the bronchial tubes, especially in someone who has pre-existing emphysema and who is a cigarette smoker and who because of those reasons has less of an ability to clear out draining mucus. This infection also has an antibiotic resistant staph aureus in it which would put plaintiff at risk of developing pneumonia even while taking Biaxin. Dr. Roth indicated that smoking is also a "recognized risk factor for bacterial pneumonia." In addition to suppressing the action of cilia that clear mucosa from the airways, smoking increases respiratory tract bacterial colonization and alters the bacteriology of community-acquired pneumonia. Dr. Roth also cited plaintiff's hypothyroidism, asthma, multiple allergies and exposure to an ill family member as additional factors that are known contributors to respiratory reaction and likely causes of plaintiff's subsequent pneumonia.
31. Dr. Roth indicated that all of these factors, unlike Neurontin use, are known and medically proven causes of pneumonia in the peer reviewed medical literature.
32. Dr. Roth disagreed with Mr. Shults' statement that there was a temporal relationship between the taking of Neurontin and the development of pneumonia. Plaintiff started taking Neurontin in the middle of December and later reduced the dosage, but did not develop pneumonia until after the first week of January. Dr. Roth also disagreed that alleged somnolence from Neurontin had anything to do with the development of pneumonia. He pointed out that plaintiff never complained to her doctor of somnolence after having her dosage reduced, and she even admitted to going out and visiting individuals (for instance to take care of her grandson) which is contrary to her claims of sleeping nearly 24 hours a day.
33. Dr. Roth was of the opinion to a reasonable degree of medical certainty that plaintiff's respiratory problems and pneumonia were more likely than not caused by a combination of pre-existing disease of emphysema, pre-existing disease of asthma and pre-existing sinusitis bacteria that were resistant to the antibiotic she got three days before admission to the hospital. He further was of the opinion to a reasonable degree of medical certainty that there was no relationship between plaintiff taking Neurontin and the development of pneumonia.
34. Dr. Wilson testified that somnolence or over-sedation can be a side effect of Neurontin, but it is not regularly seen. Dr. Wilson also testified that individuals are at a greater risk of developing pneumonia than the population in general if they have pre-existing COPD and also develop somnolence. However, the most certainty he could express in terms of an opinion was that, "Any time you have a situation of reduced respiratory capacity, you would, therefore, have a possibility of respiratory problems, one of which could be pneumonia."
35. With regard to Neurontin, Dr. Dimmig testified he had never seen anybody react to Neurontin other than to feel "somewhat lethargic on higher doses." He had never known it to cause pneumonia or any kind of pulmonary affliction.
36. The testimony of Dr. Roth is given greater weight than the testimony of Mr. Shults. Dr. Roth is a medical doctor specializing in occupational medicine and occupational asthma, whereas Mr. Shults is not a medical doctor, has only a master's degree, and is an attorney. The testimony of Dr. Roth is more consistent with the credible factual evidence presented in the claim.
37. Plaintiff has failed to present sufficient competent evidence establishing a causal relationship between her taking of Neurontin for her compensable back injury and her development of pneumonia and subsequent respiratory failure beginning on January 7, 2000. The greater weight of the competent credible evidence establishes that plaintiff's pneumonia and subsequent respiratory failure are not causally related to her compensable back injury in July 13, 1998.
38. Plaintiff had wage earning capacity prior to her hospitalization for respiratory conditions on January 7, 2000. Plaintiff has failed to prove that she has been totally disabled because of her compensable back injury since January 7, 2000 or that she is currently totally disabled as a result of her compensable back injury. The greater weight of the competent credible evidence establishes that plaintiff's current disability is instead related to her non-compensable respiratory conditions.
 * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's pneumonia and/or respiratory conditions and subsequent respiratory failure were not causally related to her compensable injury by accident on July 13, 1998. Defendants are not responsible for any treatment or disability related to such respiratory conditions. N.C. Gen. Stat. §§ 97-25, 97-27, 97-29
(2001).
2. Plaintiff's disability since January 7, 2000 has not been because of her compensable injury by accident to her back on July 13, 1998. N.C. Gen. Stat. § 97-2(9) (2001). Defendants are not responsible for payment of any disability compensation to plaintiff after January 7, 2000. N.C. Gen. Stat. §§ 97-2(9),97-29 (2001).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for medical, attendant care and disability benefits resulting from her respiratory distress, the hospitalization on January 7, 2002, and subsequent respiratory failure is hereby DENIED.
2. Defendants may terminate payment of disability compensation effective January 7, 2002.
3. Defendants are entitled to a credit for all compensation paid to plaintiff since January 7, 2000 against payment of any related future disability compensation or against payment of any permanent partial impairment rating to which plaintiff is or may be entitled for her compensable back injury on July 13, 1998.
4. Each party shall bear its own costs.
This the 5th day of May 2006
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER